

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PETER MANUEL CANDELARIA, | § | |
| | | No. 08-20-00011-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 118th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Howard County, Texas |
| Appellee. | § | |
| | | (TC#15,560) |
| | § | |

## O P I N I O N

Appellant, Peter Manuel Candelaria, appeals his conviction of aggravated assault on a public servant, to-wit: Dustin Thomas. TEX.PENAL CODE ANN. § 22.01(b).[1] In a single issue, Appellant challenges his conviction, asserting the evidence is legally insufficient. We affirm.

## BACKGROUND
### *Factual Background*

---

[1] Appellant was charged with seven offenses arising out of a single criminal action. At trial, the State filed a motion to join all seven offenses, which was granted. Appellant challenges his conviction in seven separate appeals—08-20-00007-CR, 08-20-00008-CR, 08-20-00009-CR, 08-20-00010-CR, 08-20-00011-CR, 08-20-00012-CR, and 08-20-00013-CR. Carrying forward Appellant's individual structure, we address each appeal separately. This particular appeal solely addresses appellate cause number 08-20-00011-CR, which involves the offense of aggravated assault on a public servant, to-wit: Dustin Thomas. Additionally, this case was transferred from Eastland Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001. We follow the precedent of the Eastland Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

The Big Spring Police Department had actively been attempting to locate and arrest Appellant for outstanding warrants. On the morning of December 28, 2018, Sergeant Steve Henry and Investigator Dustin Thomas conducted surveillance at a known residence of Appellant. Sergeant Henry and Investigator Thomas sat and surveilled from their respective unit vehicles—unmarked trucks equipped with red and blue lights, sirens, and radio. Based on information the officers had, they believed Appellant drove a burgundy or red Buick, and knew the license plate number. After not detecting activity, the officers took their lunch break and left the location. After lunch, Investigator Thomas returned to the location and notified Sergeant Henry that he detected movement; Appellant was "getting in and out of the house and to the vehicle." Sergeant Henry was in communication with Investigator Thomas while en route to the surveilled address when he detected the burgundy Buick and positively identified the driver as Appellant. Sergeant Henry then pulled up behind Appellant, activated the emergency lights of his undercover unit and notified dispatch of the pursuit. Appellant continued to accelerate, ran at least two stop signs, and at one point, drove in the wrong direction on a one-way street. The vehicle then stopped, and two individuals exited the vehicle—Appellant and a female. Appellant ran away and a foot pursuit ensued.

Several law enforcement officers responded to the scene upon learning of the pursuit via radio-dispatch and a search for Appellant followed. Investigator Thomas searched an alleyway and ultimately found Appellant hiding inside of a dumpster holding a firearm to his head. After confirming Appellant was armed and alerting the others, the officers all took cover. The situation morphed into what the officers described as a "standoff" that lasted over two hours. The officers involved in the standoff include: Chris Dominguez, Steve Henry, Chris Mahurin, Dustin Thomas,

2

Marc Thomas, and Rory Gammons—who are all alleged, individual victims of Appellant's respective convictions for aggravated assault on a public servant. At the time Appellant opened fire, the approximate locations of the officers were as follows: Investigator Dustin Thomas, Detective Dominguez, and Investigator Marc Thomas all standing side by side in very close proximity to one another. Lieutenant Mahurin was located a few feet north of and parallel to the aforementioned officers. Investigator Gammons was located just behind and west of Detective Dominguez.

After Appellant opened fire in the direction of the officers, Sergeant Marcus Thomas returned fire and shot three rounds, one of which struck Appellant's hand. Investigator Angelica Wilkins, a certified law enforcement negotiator, eventually convinced Appellant to surrender and exit the dumpster. A 9-millimeter pistol was retrieved from Appellant, and three empty shell casings from that pistol were later found. Appellant was arrested and taken to a hospital where he received medical treatment for his injury.

It is uncontested that during the standoff, Appellant refused to obey commands, and threatened his own life and the officers' lives; Appellant made clear he was either going to shoot himself once he was found, or the officers would have to kill him because he was not going back to prison—a tactic commonly known as "suicide by cop." The testimony, however, from each respective officer, varies in regard to the number of shots heard or seen fired from Appellant's pistol.

***Procedural Background***

Appellant was charged with aggravated assault on a public servant, to-wit: Dustin Thomas. The jury found Appellant guilty and sentenced him to the Institutional Division of the Texas Department of Criminal Justice for a term of forty years. This appeal followed.

## DISCUSSION

In a single issue, Appellant seeks reversal of his conviction, asserting the evidence is legally insufficient. We disagree.

### Standard of Review and Applicable Law

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Brooks*, the Texas Court of Criminal Appeals held the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires affording deference to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010).[2] The critical inquiry in a legal sufficiency challenge is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v.*

---

[2] Appellant incorrectly asserts a *factual* insufficiency claim; the court in *Brooks* abandoned the factual sufficiency standard, codifying it to a standard of legal sufficiency. 323 S.W.3d at 915 (Cochran, J., concurring op.)("To declare the evidence factually insufficient necessarily turns an appellate judge, viewing only the cold written record, into a self-appointed thirteenth juror with absolute veto power over the twelve citizens who actually saw the witnesses, heard the evidence, and reached a rational, reasonable verdict.").

4

*State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). We measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume the fact finder resolved any conflicting inferences in favor of the verdict and we defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014) (*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

A person commits assault if the person intentionally or knowingly threatens another with imminent bodily injury. TEX.PENAL CODE ANN. § 22.01(a)(2). A person commits aggravated assault on a public servant if assault is committed as defined in Section 22.01, and the person uses or exhibits a deadly weapon during the commission of the assault against a person whom the actor knows is a public servant while the public servant is lawfully discharging an official duty. TEX.PENAL CODE ANN. § 22.02(a)(2), 22.02(b)(2)(B).

5

As applicable to the offense of aggravated assault on a public servant in this case, a hypothetically correct jury charge would ask whether Appellant: (1) intentionally or knowingly; (2) threatened another with imminent bodily injury by use of deadly weapon; (3) against a person whom he knew was a public servant while the public servant was lawfully discharging an official duty. *Id*.

*Analysis*

In the instant case, Investigator Thomas of the Big Spring Police Department was heavily involved in Appellant's ultimate arrest. Investigator Thomas spent the day surveilling Appellant in an attempt to arrest him for outstanding warrants; the surveillance led to the vehicle pursuit, the foot pursuit, and the eventual standoff. Investigator Thomas learned of the vehicle pursuit via radio and drove a distance behind Sergeant Henry and Appellant during the chase. Sergeant Henry relayed the events as they unfolded via radio and Investigator Thomas knew Appellant was now on foot, but lost sight of both Sergeant Henry and Appellant upon arrival at the scene. Sergeant Henry eventually saw Investigator Thomas and signaled him into an alleyway. Unbeknownst to Sergeant Henry and Investigator Thomas, they were physically situated near the dumpster Appellant was hiding in as they searched for him. After hearing a metal clank, the officers began to search metal structures. Investigator Thomas looked inside a dumpster and found Appellant sitting inside holding a gun to his head. Sergeant Henry confirmed to the officers that Appellant was armed, and they all took cover. Investigator Thomas described the situation as "very hectic at this point, as you can imagine." Sergeant Henry then deployed pepper spray into the dumpster and Investigator Thomas testified shots were thereafter fired from the dumpster. A second round of pepper spray was deployed into the dumpster, at which point, Investigator Thomas heard a second

6

shot fired from the dumpster. When asked to describe what he saw and heard in the alleyway as he took cover, in close proximity to the dumpster, Investigator Thomas explained:

> A. At that point, [Appellant's] left hand came over the Dumpster and pointed the gun at me and the other two officers as he progressed back and forth . . . .

.             .             .

> Q. [T]ell us about the pistol and what it was pointing at . . . ?
>
> A. The pistol from the Dumpster?
>
> Q. Yeah.
>
> A. I saw it directly come out of the Dumpster and then it come right at me, and I observed that it started to sweep back and forth.
>
> Q. Between the three of y'all?
>
> A. Yes, sir.

.             .             .

> Q. It's aimed at you three guys?
>
> A. At least. As I said previously, I don't know who was behind me because I – I'm not looking back behind me at that point.

.             .             .

> Q. What happened after that?
>
> A. We again kept yelling for Candelaria to throw the weapon out and exit the Dumpster. He continued to make -- throughout this whole event, he was continuing -- continually telling us that he's going to come out shooting or we would have to shoot him or he was going to shoot us, and he continued in that fashion after he was hit.
>
> Q. Let me stop you. Did he threaten y'all before he was shot?
>
> A. Yes.

.             .             .

7

Q. Well -- but before he was shot and while he was armed in the Dumpster, what did he have to say?

.                    .                    .

A. He made several repeating threats in the sense of we're going to have to shoot him because he's not going to come out, he's not going back to jail, he's -- we're going to have to shoot him or he's going to shoot us. Just over and over with that repetitively.

Q. All right. And how many times did you see the gun? You saw it once while he was laying in the Dumpster?

A. Yes, sir.

Q. And then you saw it as it was extended out?

A. Yes, sir. As it came over the edge towards me on my side.

Q. What were your thoughts as the gun was -- you said it was pointed at you?

A. I saw directly down the barrel, yes.

Q. What were your thoughts when -- given the language that he has used, what are your thoughts as you're looking down the barrel of the gun?

A. 'At any moment he's going to fire it at me,' is exactly what I thought, and that's why I was trying to get a target . . . .

Q. Were you in fear of your life at that time?

A. Definitely.

Q. As you're looking down the barrel of his pistol?

A. Absolutely.

Q. Was it aimed at the sky?

A. No.

Q. -- or was it aimed at you?

8

A. Directly at me. And then it waved back and forth toward -- in the proximity around me closely.

Investigator Thomas further discussed the standoff, describing he heard a total of at least three shots fired from the dumpster. Appellant himself also testified and admitted to firing his pistol at least three times. The following exchange between Appellant and the prosecutor occurred:

Q. Were you attempting to frighten the officers away?

A. Yes. I wanted them to get away from me.

Q. So your intent was to threaten them by firing that weapon?

A. To scare them, yes.

Appellant argues the testimony is to confusing, conflicting, and unreliable to support his conviction. The State counters by asserting testimonial conflicts present issues of fact and credibility for the jury to decide. We agree. The trier of fact is the sole judge of the weight and credibility of the evidence and we must we defer to that resolution. *Dobbs*, 434 S.W.3d at 170.

Based on the evidence, the following testimony and the reasonable inferences drawn therefrom, we deduce a rational jury could have concluded Appellant: (1) intentionally or knowingly; (2) threatened Dustin Thomas with imminent bodily injury; (3) knowing he was a public servant while lawfully discharging an official duty. TEX.PENAL CODE ANN. §§ 22.01, 22.02. The evidence is legally sufficient to support Appellant's conviction. Appellant's sole issue is overruled.

## CONCLUSION

For these reasons, we affirm.

April 23, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)